# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————————

## No. 96-30008

———————————————

**JOHN ANTHONY SHEEHAN,**

**Petitioner-Appellee,**

**versus**

**JOHN P. WHITLEY, WARDEN, Louisiana State Penitentiary;
RICHARD P. IEYOUB, ATTORNEY GENERAL, State of Louisiana,**

**Respondents-Appellants.**

---

Appeal from the United States District Court
for the Western District of Louisiana
(94-CV-2249-A)

---

March 11, 1997

Before JONES, DUHÉ, and EMILIO M. GARZA, Circuit Judges

EDITH H. JONES, Circuit Judge:[*]

Appellee John Anthony Sheehan was convicted of second degree murder and sentenced to life imprisonment without benefit of parole for killing his wife, Monica Jeansonne Sheehan in 1986. After his conviction was affirmed on direct and collateral review in the state courts,

---

[*]Pursuant o Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

Sheehan sought a writ of habeas corpus in federal court. The district court referred the matter to a magistrate judge, who recommended granting the writ based on Sheehan's claims that he was denied a fair trial before an impartial jury. The district court adopted the magistrate judge's recommendation and ordered the state to release Sheehan if he was not retried within sixty days. Pending appeal, the order was stayed. We conclude that the lower courts failed to defer properly to the state court findings of fact. With that error corrected, there was no basis for issuance of the writ. Accordingly, we reverse and render judgment that relief be denied to appellee.

## I. BACKGROUND

Monica Sheehan was killed in April 1986 when her husband fired a 12-gauge pump shotgun into her chest. Sheehan admitted that he was holding the shotgun when it fired, but he contended at trial that he was merely cleaning the gun and the shooting was accidental. Two Louisiana juries disagreed, and appellee was twice found guilty of second degree murder. The Louisiana appellate court reversed Sheehan's first conviction, finding that a statement by appellee had been introduced against him in violation of the constitution. *State v. Sheehan*, 515 So.2d 670 (La. App. 3d Cir. 1987), *writ den.*, 519 So.2d 129 (La. 1988). Appellee's second trial led to the confinement of which he now complains.

At that trial, Michelle Bordelon testified that after an argument in December 1984, Sheehan "told her that he didn't love her [Monica Sheehan], and didn't know why he married her, and wish [sic] he would have never married her." Exhibit A, Trial Transcript ("Exh. A") at 1178. Ms. Bordelon also testified that Sheehan abused Monica, forcing her to visit the emergency room. *Id.* at 1176-79. Monica's father testified that the marriage was troubled and recounted a phone call from

2

Monica in which he overheard Sheehan threaten to kill her.[1] *Id.* at 1196. Monica's mother also testified to marital difficulties between Sheehan and Monica. *Id.* at 1209-11. Monica's step-father testified that Sheehan talked to him in July or August of 1985 about marital difficulties, indicating that he wanted out of the marriage.[2] *Id.* at 1220-21.

The state also introduced a $50,000 John Hancock insurance policy on Monica's life purchased on April 17, 1986, thirteen days before she died. The agent, Thomas McCullom, testified that Sheehan already had a policy on Monica's life dating from 1984 in the amount of $25,000, and the increase in insurance coverage ordered by Sheehan was unsolicited. The John Hancock application indicated that appellee did not contemplate acquiring any other insurance on Monica's life. Appellee made the policy effective immediately by delivering a military allotment to Mr. McCullom.

On April 23, just seven days before Monica's death, Sheehan initiated steps to secure an additional $75,000 insurance policy covering Monica's life. The State Farm representative, Phyllis Hester, testified that appellee arrived at her office on April 24 without Monica, despite Mrs. Hester's admonition that Monica's signature would be necessary. *Id.* at 1057. Mrs. Hester sent the policy, complete except for blanks requiring Monica's signature, home with Sheehan. When Sheehan

---

[1]     "Anthony Sheehan was hollering over the phone that if you tell your daddy anything about what's going on over here, I'm going to kill you; and if he comes down over here, I'm going to fight with him and I'm going to kick him on his bad leg." *Id.* at 1196.

[2]     "Well, I asked him [Anthony Sheehan] what their problem was, and he told me that he just didn't love her; that he thought he did, but he didn't. And that he would do anything that it took to get her out of his life." *Id.* at 1221.

3

returned the policy early the next morning, the spaces contained Monica's purported signature.[3] *Id.* at 1059. To make the policy effective immediately, Sheehan paid premiums for two months in cash and returned to pick up the signed binder that day, instead of accepting Mrs. Hester's offer to mail the binder once the agent had signed it. *Id.* at 1063-64. The parties stipulated that the state's handwriting expert would testify that the signature purporting to be Monica's on the State Farm policy application was actually Sheehan's forgery. *Id.* at 1252.

When the shooting occurred, Monica was sitting on the floor in front of her husband playing a game. He was sitting in a chair and allegedly began to clean a 12 gauge pump shotgun with an oily rag when the gun fired. Monica was shot in the chest. The doctor who performed the autopsy on Monica's body testified that appellee's explanation that the shooting was accidental was inconsistent with Monica's injuries and the trajectories of the buckshot. *Id.* at 1108-1128.

Detective Robert Venable testified that three unspent shotgun shells were found -- two on the floor and one in the chamber of the shotgun. *Id.* at 1325-26. A nurse who arrived at the scene soon after the shooting testified that two unspent shells and a spent shotgun shell were lying on the floor near Monica's body. Detective Venable did not find a spent shell on the floor but found a spent shell in the chamber of the shotgun.

The jury, by a 10-2 vote, found Sheehan guilty of second degree murder. Appellee subsequently filed a motion for new trial on the grounds that David Trimbur, the jury foreman, had concealed his position as an auxiliary sheriff and his relationship with Detective Venable. Appellee

---

[3] "Mr. Sheehan arrived at our office the next morning, on the 25th, very early. Our office opens -- we work at 8:00, but we don't open to the public until 8:30. And he was sitting in the parking lot when we unlocked the doors." Exh. A at 1059.

4

also alleged that members of the jury had learned of his prior conviction on this charge. After an evidentiary hearing, the trial judge denied the motion for new trial. Appellee obtained a writ from the Louisiana Supreme Court ordering the trial court to reopen the hearing on the motion for new trial on the grounds that appellee had newly discovered evidence. On remand, the trial court heard the new evidence and again denied the motion for new trial. This time, appeals were unsuccessful. State v. Sheehan, 558 So.2d 758 (La. App.3d Cir. 1990).

Sheehan filed this petition for writ of habeas corpus, alleging a denial of the right to trial by an impartial jury because 1) Trimbur concealed information that would have supported a challenge for cause and 2) the jurors learned of appellee's prior conviction for the same crime. The magistrate judge found that the state court applied the wrong legal standard to appellee's claim and thus disregarded the state court's findings of fact. The district court concurred, leading to a conditional grant of the writ and this appeal.

## II. DISCUSSION

### A. Standard of Review.

The President signed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) on April 24, 1996. Pub. L. No. 104-132, 110 Stat. 1214 (1996). This circuit has held that the AEDPA applies to appeals pending as of the effective date of the act. *Drinkard v. Johnson*, 97 F.3d 751, 754 (5th Cir. 1996). AEDPA amended the substantive standards of review applicable to habeas cases.

In *Drinkard*, the panel determined that applying § 2254(d)(1) as amended by the AEDPA to pending cases did not raise retroactivity problems since the amendment is a "change in

5

procedural rules" involving "federal standards of review of state court decisions." 97 F.3d at 766.

A habeas petitioner cannot demonstrate reliance on the "former federal standards of habeas review in making strategic, tactical, or other decisions during the state court litigation." *Id.* AEDPA has codified standards for reviewing both the legal and factual determinations of state courts pertinent to a habeas case. With respect to any claim "that was adjudicated on the merits in state court proceedings," a writ shall not be granted unless the petitioner shows that the state court adjudication

> (1) resulted in a decision that was <u>contrary to</u>, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA § 104, codified at 28 U.S.C. § 2254(d) (emphasis added). AEDPA shields state court findings of fact from reversal in federal court by a presumption of correctness, which may be rebutted only by clear and convincing evidence. AEDPA § 104, codified at 28 U.S.C. § 2254(e)(1).

The following analysis will demonstrate that the lower courts' grant of relief did not satisfy these high standards, but it will also show that, even under pre-AEDPA standards, the lower courts failed to give the appropriate deference to the state court findings. State courts of competent jurisdiction, after a hearing on the merits, made written factual findings supported by the record as a whole. See 28 U.S.C. § 2254(d) pre-AEDPA. We must defer to the state court findings in the absence of any proof that deference was unwarranted; the lower federal courts' mere disagreement with state court factfindings did not confer authority to disregard them.

**B.        Reverend Trimbur**

The magistrate judge decided that Sheehan's Sixth Amendment right to a fair trial before an impartial jury was violated because the jury foreman, Reverend David Trimbur, concealed on voir dire that he was a reserve deputy sheriff. This concealment allegedly created an inference of bias which, according to the magistrate judge, would have supported a challenge for cause. The alleged concealment also rendered Sheehan's counsel unable to exercise their peremptory strikes intelligently. The state argues that the magistrate judge failed to give proper deference to the state court findings that Trimbur was not biased. We agree with the state.

To demonstrate that he is entitled to a reversal, a federal defendant who complains that a juror mistakenly responded to a question on voir dire must first demonstrate that a juror failed to answer honestly a material question, and then further show that a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555-56, 104 S.Ct. 845, 849-50 (1984). We will assume, *arguendo*, that appellee must at least meet this standard to justify relief in a federal habeas proceeding. *See Montoya v. Scott*, 65 F.3d 405, 419 (5th Cir.) ("[W]e assume, *arguendo*, that a *McDonough* theory of juror bias would be sufficient to obtain federal habeas relief."), *cert. denied*, ___ U.S. ___, 116 S.Ct. 1417 (1995).

**1.        Voir dire.**

Juror Trimbur was pastor of the Marksville Baptist Church and an auxiliary deputy with the Avoyelles Parish Sheriff's office. During voir dire, Trimbur was asked:

7

Q: Are you or any members of your family, or close friends, employed by the District Attorney's Office, or by the Sheriff's Office?

A: No sir.

*****

Q: Is there any personal, business, family or health reason, that you know of, why you could not serve as an impartial juror in this case?

A: None that I know of.

Exh. A at 918, 919-20. Trimbur was also asked about a Concerned Parents for Better Avoyelles meeting that he attended approximately five weeks prior to trial. Trimbur indicated that he was there in his capacity as a minister and for personal interest and made no mention of any official role he might have played.[4]

---

[4] The relevant examination of Trimbur by defense counsel was:

Q. OK. Now, ... I understand there's some kind of community -- I don't want to say outrage or up-roar, but conflict about drinking in one of the neighboring towns, and teenage drinking; and Mr. Rabalais [one of the defense attorneys] is involved in that. ... Have you been to any meetings that Mr. Rabalais's attended or you've attended or Mr. Knoll's [the district attorney] attended, on that issue?

A. Yes.

Q. Tell me about that.

A. I went to see what was going to transpire in the way of exchange of dialogue with the gentleman representing our ABC Board Camp. Mr. Rabalais's connection with that has no bearing on me, OK? I wouldn't -- I don't portray myself with this word, 'outrage.' OK?

Q. Well, I don't know what the right word is, OK? I'm just looking for a word ... conflict ...

A. I attended one meeting at the Concerned Parents for Better Avoyelles, if that's what you're referring to.

Q. I don't know.

A. Yes sir, that, I think, is what you're referring to. Mr. Rabalais [one of the defendant's lawyers] was present at that meeting; I know that.

Q. OK, and what about Mr. Knoll [the district attorney]?

A. Yes sir.

***

8

Later, Trimbur was asked about his knowledge of people involved with the investigation or trial of the case. Examination by defense counsel relating to Detective Robert Venable proceeded as follows:

> Q. Let me ask you some names and see if you know these folks.
> A. Yes sir.
> Q. Detective Robert Venable with the Sheriff's Office?
> A. Yes sir.
> Q. And how do you know Detective Venable?
> A. I performed his wedding a year and a half ago.
> Q. All right. And, did you have to -- when I got married, I met with he preacher in advance, and he kind of counseled you and stuff, did you do any of that, or did you just do the ceremony?
> A. I just did the ceremony.
> Q. All right. Did you know his wife?
> A. Yes, I did.
> Q. Was she a member of your congregation, or he?
> A. She was. That was in Evergreen.

> Q. I'm not from here, and I don't know the history of all this. But I understand that there are some interests -- I don't -- I won't use a catch word, that there's some "interests" and there may be a problem with teenage drinking and driving in particular area[s] of the parish. Is that accurate?
> A. That's accurate.
> 
> ***
> 
> Q. OK, where is -- what is your interest in that issue? ... And, does that come from just a personal interest as an individual, or is that through your representing the interest of your congregation, or of your religion or, you know, whatever?
> A. Through my church ... that was through personal interest as an individual.
> Q. OK. And, has the -- is the District Attorney, does he have anything to do with that issue, to your knowledge?
> A. I think as a concerned parent, he was at the meeting.
> Q. OK. But not in an official -- there's no official request to him, that you're aware of, or none by you, that ...
> A. None by me.
> Q. All right, and none that you're aware of, that you have any action upon?
> A. Not that I know of.

Exh. A at 927-929.

9

```
Q.      All right, have you had any contact with him since that time?
A.      I saw him yesterday for a few minutes in the hall, and I asked
        him about his marriage.
Q.      Other than that?
A.      No sir.  Not really.
```

Exh. A at 930.

### 2.      Motion for new trial.

In considering Sheehan's motion for new trial, the Louisiana trial court held an evidentiary hearing during which it heard the testimony of Detective Venable, Sergeant Malcolm LaBorde, Trimbur, and Captain Gano Bergeron.  The testimony focused on the extent of Trimbur's participation as an auxiliary deputy, Trimbur's relationship with Detective Venable, and Trimbur's explanation of his answers given in voir dire.

**Trimbur's service with the Sheriff's Department.**  Trimbur had been an auxiliary deputy since 1985.  His involvement appeared to peak in 1986, but tapered off in 1987 as his job at a new congregation required more of his time.  However, he still served as a deputy up to and after the April 1988 trial.  Auxiliary deputies are required to spend 16 hours per month serving the department and are not generally paid.  However, Trimbur had been paid $38.53 in November 1987 for one day's work guarding an inmate at a local hospital. Trimbur had ridden in a patrol car with regular deputies, wore a uniform identical to that of a regular deputy, carried a badge, carried a gun, had officer training, and sometimes visited the Sheriff's office when he was not on duty. The Sheriff's office is adjacent to the jail, and Trimbur had counseled prisoners and deputies on spiritual issues. Trimbur had also been called to assist with a crisis relating to Cuban refugees at the jail.  Trimbur testified that he had not seen Sheehan at the jail.

10

At the Concerned Parents for a Better Avoyelles meeting five weeks before the trial, Trimbur had volunteered to the entire group that he was an auxiliary deputy and would relay any concerns that individuals had to the district attorney, sheriff or other appropriate authority.

**Trimbur's relationship with Detective Venable.** Detective Venable had at least some role in facilitating Trimbur's appointment as an auxiliary sheriff in 1985. In 1986, Trimbur was the pastor of the Evergreen Baptist Church, which Detective Venable attended with his wife, and Trimbur occasionally visited Detective Venable at the Sheriff's office. In 1987, Detective Venable saw Trimbur about once a month, and he had also seen Trimbur at the Sheriff's office in 1988. Detective Venable testified that he had been to Trimbur's home approximately six times; the most recent visit occurred several months before the trial.[5] Detective Venable had seen Trimbur about three or four times between January 1988 and April 1988, the time of the trial, and they had discussed the detective's marital problems. However, Trimbur was unaware as of the hearing in June 1988 that Detective Venable had separated from his wife in January 1988. Trimbur had not talked to Detective Venable since the trial began.

**Trimbur's explanation of his voir dire testimony.** Trimbur stated that he did not reveal his commission as an auxiliary deputy because no one directly asked him about it and he did not consider himself to be "employed" by the Sheriff's office. Trimbur testified that he considered the question about employment by the sheriff's office as a follow-up to the earlier instruction by the court that "members of paid fire and police departments" are entitled to claim an exemption, and he

---

[5] Trimbur only recalled two visits when Venable accompanied other parishioners to Trimbur's home for coffee.

11

did not consider himself a paid policeman. Trimbur felt that his involvement with the sheriff's department was minimal, and that he was looked upon as an unofficial chaplain rather than an officer. He had forgotten about the one day on which he supervised a hospitalized inmate and was paid $38. Furthermore, Trimbur did not report in voir dire that he had revealed his deputy status at the Concerned Parents For a Better Avoyelles meeting because the district attorney, Mr. Knoll, and two of the defense lawyers, Mr. Rabalais and Mr. Melancon, were present when he made the announcement.[6]

---

[6]    Trimbur's extensive explanation was contained in the following testimony:

Q.    And please tell me where the meeting was, what the meeting was about and what statement you made.

A.    The meeting was Concerned Parents For a Better Avoyelles, is the name under which they were meeting. It was the second meeting that they had, the only meeting that they have had that I attended. I was present, two men from the church I serve was present and my wife was present. It was at Mr. Knoll's [the district attorney] home on March 15th. I went in for the purpose of getting information for my own curiosity about matters related to problems of under-aged drinking in our parish.

Q.    Finish your answer, please.

A.    Well, I was at that meeting, and that's when I made a statement about being an auxiliary ...

Q.    I'd like for you to tell us if you can, please, the specifics, as you recall them, relating to what caused you to make that statement who you were talking to, who was present, what was the context of the statement, and what you said. I want you to tell us about your actions, not anyone else's.

A.    The meeting was called for the purpose of hearing from board member or official of the ABC Board of our State, as to ways that could be explored so that the established laws about under-aged drinking could be better enforced. The gentleman from the ABC Board was there and was telling us of his frustrations from problems that he had in relation to manpower, not being able to get out into the community, and so forth. He made a statement that -- something to the effect -- and I don't remember the exact words -- something to the effect that if there were people in the parishes that he could call upon for assistance, it would facilitate their being able to follow up on complaints about business establishments, selling intoxicating beverages to under-aged

12

Sergeant LaBorde testified that he had asked Trimbur how he had been selected for jury service, since, in his view, "if somebody's working at the Sheriff's Office, they don't serve on the jury." Exh. A at 1555. Sergeant LaBorde testified that Trimbur responded: "somebody had asked him some questions, you know, if he was working with them, and he said yes." *Id.* at 1556.

**State court findings.** The state trial court denied the new trial motion, crediting Trimbur's explanation that he associated the question about employment with the sheriff's office with

---

youth. There was between 35 and 40 people at that meeting. I spoke up, there wasn't a lot of us talking; we were listening to Mr. ... the man who was -- the ABC Board man. I spoke up and said in that meeting, in the presence of these people, and I know they heard me, I said, I have a commission, I am a deputy, I have a uniform, if you ever need help in this parish, in this area, call me and I will see if I can work out a way to be of assistance to you. And at that meeting, the prosecuting attorney was there; he was hosting the meeting, and so was both attorneys for the defense present. Mr. Rabalais was sitting immediately to my left, I was immediately to this gentleman's left, that was there; I was sitting on the steps; he was standing; I remember distinctly Mr. Rabalais, the attorney, and Mr. Melancon, the attorney, being at that meeting. So, when I came to court, having been called for jury selection, I listened very carefully to Judge Brouillette's discourse to us about qualifications, disqualifications, and exemptions. I heard him very clearly say that a minister of religion could claim an exemption. I heard him say very clearly that a member of paid fire or police department could be exempted. I did not, when the line formed at his bench, come up and tell him I was a minister of religion. I did not come up and tell him I was an auxiliary deputy, in any capacity. I felt that my involvement with the Department was minimal; I thought that I was looked upon more as a chaplain there, than I was as a policeman. And so, I didn't say anything about being a minister, either, until it came out in the questioning, positively I knew, both, the prosecuting attorney and both local defense attorneys, heard me made that statement, just five weeks before that I was an auxiliary. And I felt if it was of any consequence, they would bring it up. It wasn't to me. And so I ..

Q.    Rev. Trimbur ...

A.    I know it's a long answer, but I'm trying to explain to you why I didn't say anything.

Exh. A at 1571-73.

13

the exemption available for paid members of police departments. The trial court found that Trimbur's

interpretation of the questioning was reasonable. The court noted:

> It may be argued that Trimbur's answer to the question was less than
> full disclosure, even if technically correct. However, his testimony
> makes it very clear that he did not intentionally mislead anyone. He
> considered his service as a volunteer auxiliary deputy to be such
> common knowledge that it did not deserve special comment in the
> voir dire questioning.
>
> ****
>
> The testimony of Rev. Trimbur depicts, in the court's opinion, a very
> civic-minded individual who wanted to be a good citizen and to
> participate in civic activities. In voir dire by defendant's counsel,
> when asked why he did not avail himself of his exemption as a
> minister, he answered as follows:
>
>> Because I'm not just a member or servant of my
>> church; I'm a member of my community; and I feel
>> strongly an obligation to the community.

Exh. A at 1657-58.

The trial court reasoned that since Trimbur had no knowledge of or connections to

the crime, the only way to show he was biased and, consequently, disqualified would be if law

enforcement officers were disqualified per se.[7] Reviewing the relevant Louisiana law, the trial court

---

[7]   The court evaluated whether Trimbur's activities categorized him as a law
enforcement officer:

> The factors which show him to be in the law enforcement community are that he had
> a uniform; he occasionally went on patrol with paid deputies; he had a badge; and he
> had a firearm. The factors which suggest that he was not truly a law officer are
> that he never made an arrest; he never interrogated a witness; he never used a firearm
> and never had firearm training; and he never participated in any investigation. While
> he did not have the title of chaplain, he considered his position to be essentially that.
> He counseled deputies; he counseled prisoners in the jail; he conducted prayer
> services when a deputy died in a plane crash.

Exh. A at 1657-58.

14

held that a volunteer auxiliary deputy would not be automatically disqualified. *See State v. Ballard*, 337 So. 2d 481, 483 (La. 1976) (denial of challenge for cause against unpaid volunteer deputy sheriff was not error; "We find no prohibition against jury service by an unpaid volunteer [auxiliary policeman] who peripherally and occasionally assists in law enforcement.").

In addition, the trial court found that the motion should be denied because Sheehan had not established that he and his counsel were unaware of Trimbur's commission. *See State v. Baxter* 357 So. 2d 271 (La. 1978) ("...in order for a defendant to avail himself of the lack of qualification of a juror, it must be made to appear that the disqualification of the juror was not known to defendant, or his counsel, when the juror was accepted by him and could not then have been ascertained by due diligence; and it must be made to appear that such diligence was exercised by an examination of the juror, on his voir dire, touching his qualifications, and that he answered falsely."). The trial court noted that only one of appellee's lawyers, Rodney Rabalais, testified that he was unaware that Trimbur was an auxiliary deputy. Lewis Unglesby and Tucker Melancon, appellee's other two trial lawyers, did not testify to a lack of knowledge. The trial court also noted Trimbur's testimony that he was sure that Rabalais and Melancon knew Trimbur was a deputy. Further, as in *Baxter*, the trial court found that "if it was error for Trimbur to answer that he was not employed by the sheriff's office-- and that is certainly not clearly established--then it should be recognized that he was entirely honest." Exh. A at 1660.

As to Trimbur's relationship with Detective Venable, the trial court first noted that this relationship was not urged as a basis for a motion for new trial. The trial court recounted the short voir dire examination of Trimbur regarding Detective Venable, and concluded that defense

15

counsel was aware of the friendship and should have probed it further. The court further found that "[t]here is nothing to suggest, in the court's opinion, that Trimbur intentionally misled or deceived defense counsel." Exh. A at 1662.

### 3. Remand from the Louisiana Supreme Court.

Before his appeal was heard by the intermediate court of appeals, Sheehan obtained a writ from the Louisiana Supreme Court ordering the trial court to reopen the hearing on the motion for new trial based on an allegation of newly discovered evidence. At the reopened hearing, appellee presented the testimony of Claire Sharp, a local attorney and member of Trimbur's congregation, who testified that Trimbur had contacted her after receiving a jury summons. Ms. Sharp testified that Trimbur asked for advice about the effect of his religious profession as well as his auxiliary commission on his ability to serve. Ms. Sharp told Trimbur to tell the court and the attorneys about his positions, or to at least answer the voir dire questions openly and honestly. Ms. Sharp also testified that Trimbur told her that "I guess it doesn't matter; everybody knows I'm a minister and an auxiliary deputy anyway," and she responded "yes, I suppose that's true; this is a small town." Exh. A Supplement at 40.

After hearing this new testimony as well as additional testimony from Trimbur, the trial court again denied the motion for new trial. The trial court concluded:

> There is certainly nothing ominous, as such, about a prospective juror, calling an attorney, prior to serving, to find out what it's all about, particularly in this case, a member of his congregation. I would suppose it's probably a common occurrence, especially summoned for the first time. Now, if the purpose of talking with an attorney would be to conspire, to do anything improper, then, of course, that would be most significant. The record shows Rev. Trimbur's explanation for the call. It is totally consistent with the testimony of Mrs. Sharp. I

16

have no difficulty accepting his explanation. And I certainly don't feel that he was attempting to calculate a way to mislead anybody in order to serve on the jury. My findings in the reasons for denial of the first motion for a new trial, that he did not attempt to mislead anybody, is certainly still my finding. There's absolutely nothing to suggest that there was any improper reason. In fact, the evidence shows just the opposite.

Exh. A Supplement at 42-43.

### 4. Appeal to the Louisiana Court of Appeals.

In affirming the denial of the new trial motion, the court of appeals opined at length:

We have examined this record closely and find that there is nothing in it, nor in the nature of Trimbur's function with the sheriff's office, which would disqualify him from service on the jury. It is apparent that he was a clergyman first, and an auxiliary deputy second. His responses on voir dire were not misleading, and did not conceal any information. His relationship to the sheriff's office, as well as his relationship with Detective Venable, were not such as could be expected to destroy the otherwise impartial attitude of this juror. Trimbur was subjected to intense interrogations in an effort to prove specific facts showing such a close connection to the sheriff's office and Detective Venable that bias for the prosecution should be presumed. Trimbur's consistent responses in the record reflect his voir dire commitment to fairness and impartiality. Nothing he said at the hearings supported a finding of bias, actual or implied. What comes across most strongly in the record of all three examinations-- the voir dire, the new trial hearing, and the remand hearing--is his relationship with the community and its citizens in his capacity as a minister of religion. He neither sought nor avoided jury duty. He answered every question candidly and without rancor, openness characterizing his every response. Only by a strained manipulation of his words can bias be wrung from his testimony. We agree with the trial court.

*Sheehan*, 558 So.2d at 763-64.

### 5. Findings of the magistrate judge.

Contradicting the state court's credibility evaluations, the magistrate judge concluded that Trimbur "deliberately concealed" his auxiliary deputy status and friendship with Detective Venable during voir dire because he did not think it was important and "because he wanted to be on the jury." The magistrate judge drew an inference of bias, citing *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (juror's censoring of fact that brother was a deputy sheriff created inference that he wanted to serve on jury and thought he would not be allowed to serve if he answered completely). The magistrate judge chided the trial court for having "no good basis" to believe that Sheehan's attorneys knew Trimbur was an auxiliary deputy. The magistrate judge then concluded that Sheehan satisfied the first prong of *McDonough*--that a juror had falsely answered a material question on voir dire.

The magistrate judge also decided that a challenge for cause against Trimbur would have been granted because he was an auxiliary deputy. "Louisiana jurisprudence is clear on that point," he stated, citing *State v. Simmons*, 390 So.2d 1317, 1318 (La. 1980) ("an actively employed criminal deputy sheriff is not a competent criminal juror") and *State v. Mitchell*, 475 So.2d 61, 63-4 (La. App. 2d Cir. 1985) (active or reserve police officer is too likely to be influenced as a juror and should be disqualified).

After reciting the concept of deference to state court findings, the magistrate judge concluded that the trial court did not actually find that Trimbur was not biased. And since the magistrate judge read Louisiana law as automatically disqualifying auxiliary deputy sheriffs from jury service, he disagreed with the state courts' application of state law.

18

**6.** **Analysis.**

Whether analyzed under the old or new federal habeas standards, the magistrate judge clearly erred in failing to give appropriate deference to the findings of the Louisiana courts.

The magistrate judge held that the trial court made no express finding whether Trimbur was biased and that Trimbur deliberately concealed information on voir dire, supporting an inference of bias. Yet the trial court explicitly found that Trimbur did not "intentionally mislead anyone," that he "was entirely honest in his answer," and that "there is nothing to suggest ... that Trimbur intentionally misled or deceived defense counsel." The trial court so ruled after observing voir dire, the entire trial, and two motions for new trial. The record amply supports the state trial court's conclusions. The trial court credited Trimbur's explanation that he reasonably associated the question about employment with the sheriff's office with the exemption for paid policemen, an exemption he believed was not available to him. The trial court found that Trimbur reasonably believed he was not "employed" by the sheriff's department in the common usage of that term. Further, the trial court credited Trimbur's testimony that he believed that all the attorneys knew of his status as an auxiliary deputy, because he had announced it in the attorneys' presence just five weeks before trial. Thus, even if an inference of bias can be drawn from deliberate censoring during voir dire, the trial court found, contrary to the magistrate judge, no deliberate censoring on Trimbur's part. The state court made explicit findings, adequately supported by the record, that are contrary to the inferences drawn by the magistrate judge. Deference was owed to the state court fact findings, particularly because they were reached after painstaking, meticulous efforts to uncover the relevant

19

facts. Under the AEDPA standard, Sheehan did not prove by clear and convincing evidence that the state court findings were incorrect. *See* 28 U.S.C. § 2254(e)(1) (as amended by AEDPA).

Moreover, the Louisiana court of appeals explicitly found a lack of bias. *Sheehan*, 558 So.2d at 764 ("Nothing he said at the Hearings supported the finding of bias, actual or implied."). Findings of state courts at all levels must be given appropriate deference. *Rushen v. Spain*, 464 U.S. 114, 120, ___ S.Ct. ___, ___ (1983) (per curiam). The magistrate judged erred by not even addressing this finding.

Also contrary to the magistrate judge's conclusion, the Louisiana courts correctly applied Louisiana law in the issue of disqualifying auxiliary deputies. While the magistrate judge quotes language from *Simmons*, 390 So.2d at 1318, and *Mitchell*, 475 So.2d at 62-63, that supports his interpretation of Louisiana law,[8] compelling caselaw justifies a conclusion that someone in Trimbur's position would not be automatically disqualified from jury service. The trial court cited the decision in *Ballard*, in which the Louisiana Supreme court held that it was unnecessary to grant a challenge for cause against an unpaid volunteer deputy sheriff. 337 So.2d at 43. But perhaps most relevant is the decision of the court of appeals in this very case, which the Louisiana Supreme Court declined to reverse, holding that "there is nothing in [the record], nor in the nature of Trimbur's function with the Sheriff's office, which would disqualify him from service on the jury." *Sheehan*, 558 So.2d at 763.

---

[8] However, *Simmons* involved a paid, full-time investigator with the Sheriff's department 390 So.2d at 1318, and *Mitchell* involved an active reserve police officer, and although it is not clear from the opinion, it appears that the officer was a paid employee. *Mitchell*, 475 So.2d at 62-63.

20

Thus, the magistrate judge erred in disregarding the state court findings in this case and in concluding that Sheehan met the two prongs of *McDonough*. We must defer to the state court findings that Trimbur did not intentionally mislead the court or defense counsel, and that even full information regarding Trimbur's position with the Sheriff's department and his relationship with Detective Venable would not support a challenge for cause.[9]

Alternatively, the denial of the motion for new trial can be sustained on the independent state law ground that Sheehan's trial attorneys knew of Trimbur's status as an auxiliary deputy sheriff and failed to use reasonable diligence to pursue further information about his relationship with the sheriff's department. The magistrate judge erroneously concluded that the trial court "had no good basis" for believing that the defense attorneys heard Trimbur announce his auxiliary deputy status at a "noisy public meeting" five weeks earlier, remembered it, and "deliberately concealed the fact of Trimbur's employment as a deputy sheriff as a trial strategy." First, the state trial judge had ample basis: Trimbur testified that one of the attorneys sat right next to him at the meeting, that he made the announcement loudly, and that "no one else was speaking at that time. I cannot conceive of everyone in that room not having heard what I said." The trial judge was not required to believe Mr. Rabalais' testimony that he never heard Trimbur's announcement. Second, Trimbur's wife worked for a company owned by Tucker Melancon, one of appellee's attorneys. Finally, the trial judge never found that appellee's attorneys deliberately concealed their knowledge of Trimbur's background as a trial strategy. Louisiana law requires the defendant to show that he

---

[9] Even if Louisiana law would have supported a challenge for cause based on Trimbur's auxiliary deputy status, Sheehan has still not shown that he is <u>constitutionally</u> entitled to a challenge for cause on that basis.

21

and his lawyers had no knowledge of the facts supporting disqualification and used reasonable diligence to pursue these facts. The trial court found that Sheehan had not met this burden, not that his attorneys deliberately concealed the information as trial strategy. The magistrate judge's contrary conclusion is a clear error. Sheehan's challenge to Trimbur's service on the jury fails on this adequate and independent state law ground as well.

### C. Prejudicial extraneous information

The magistrate judge also decided that Sheehan's right to a fair trial before an impartial jury was violated because, before reaching the verdict, one or more jurors learned of Sheehan's prior trial and conviction for this same crime. The state again objects that the magistrate judge failed properly to defer to the state court findings of fact and applied the wrong legal standard.

The Supreme Court's cases in this area "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036 (1975). In federal trials, exposure of the jury to information about prior felony convictions is presumed to be prejudicial, but this is a rule based on a federal court's inherent power to control its proceedings and is not constitutionally required. *Id.* at 797, 95 S.Ct. at 2035 (rejecting the application of *Marshall v. U.S.*, 360 U.S. 310 (1959) to a state prisoner's claim on federal habeas corpus). Instead, "we must turn ... to any indications in the totality of the circumstances that petitioner's trial was not fundamentally fair." *Id.* at 799, 95 S.Ct. at 2036. Although a juror may be presumed to be biased if exposed to "inherently

22

prejudicial facts about the defendant" so that "the court deems it highly unlikely that the juror can exercise independent judgment," the "court will not readily presume that a juror is biased solely on the basis that he or she has been exposed to prejudicial information about the defendant outside the courtroom." *Willie v. Maggio*, 737 F.2d 1372, 1379 (5th Cir.), *cert. denied*, 469 U.S. 1002 (1984). Thus, we must decide if "the actions called into question were such as to reasonably result in the possibility of prejudice." *Durr v. Cook*, 589 F.2d 891, 894 (5th Cir. 1979). Evaluation of a claim requires findings relating to the impact of the extraneous information on the verdict. *Id.* at 894.

In considering appellee's motion for new trial, the trial court conducted a hearing[10] at which Terri Taylor, a juror who voted not guilty, testified that she was told of the prior trial and conviction at church. Mrs. Taylor testified that although she did not tell any other jurors about what she learned, she heard other jurors discuss appellee's previous trial and conviction. Mrs. Taylor also testified that David Gauthier, another juror, spoke about appellee's prior trial and conviction.[11] Exh. A at 1639. Mrs. Taylor also testified that another juror, Burnette Bordelon, related to Mrs. Taylor that Mrs. Bordelon's husband read aloud a newspaper article about the trial at breakfast. *Id.* at 1641.

---

[10]    The trial court sustained the state's objections to testimony about juror misconduct under La. R.S. 15:470 (replaced by La. C. Art. 606), which allows testimony by jurors as to misconduct by third persons but not as to juror misconduct. However, the trial court allowed Sheehan to offer testimony of juror misconduct as a proffer, recognizing that this evidentiary rule must give way to a defendant's constitutional right to a fair trial. *State v. Senigal*, 393 So.2d 684 (La. 1981). The trial court's discussion of prejudice assumes that the proffered evidence is admissible. Exh. A at 1665.

[11]    Mrs. Taylor testified that "... it was in the jury room on Saturday morning, and he had said he knew a friend of a friend, or a relation somewhat to that nature, that had served on the previous jury, and that he had considered that night calling and speaking with him, but he had changed his mind; he decided not to, because he didn't want to be prejudiced." Exh. A at 1639.

23

Mrs. Taylor did not indicate whether the newspaper accounts discussed a prior trial.[12] However, Mrs. Bordelon denied that she had read any article about the trial or that her husband had read aloud any article about the trial. *Id.* at 1618.

Gwendolyn Small, an alternate juror, testified that she overheard other jury members say that the defendant had been tried before, but not that the defendant was convicted. Exh. A at 1626. She could not remember who said it or when. Trimbur also testified that he learned at the end of the day on the last day of deliberations that Sheehan had previously been tried, but not that he had been previously convicted. *Id.* at 1586-87.

The trial court found that the only evidence that the jury heard of appellee's prior conviction came from the testimony of Mrs. Taylor, who voted to acquit and thus was not prejudiced, and who stated that she did not discuss the prior convictions with other jurors. The trial court also pointed to its instructions to the jury to consider only the evidence introduced at trial, recognizing that such an instruction could not cure all error but was a factor in the overall consideration of prejudice. Further, the trial court considered evidence that a previous jury had convicted the defendant for the same conduct to be less prejudicial than evidence suggesting a pattern of conduct, such as that the defendant had been convicted of similar conduct in the past.[13] The trial court did not believe that a defendant had an absolute constitutional right to have a jury that had not heard of his

---

[12]     The trial court noted that it had monitored news accounts of the trial and that none had mentioned the prior trial or conviction while the trial was in progress.

[13]     "There is no reason for a juror to believe that another jury had more or better evidence than in the present case." Exh. A at 1667.

24

prior conviction and concluded that any extraneous influence on the jury "was not prejudicial to the extent of requiring a new trial."

The magistrate judge decided that the trial court's ruling was based on an erroneous conclusion of law--that juror knowledge of a prior conviction for the same offense was not a per se constitutional violation--and gave the trial court findings no deference. The magistrate judge inferred that other jurors must have participated in the discussions of appellee's prior trial and conviction, and thus inherently prejudicial extrinsic information was considered by the jury. The magistrate judge relied primarily on cases reviewing federal criminal convictions. *See*, *e.g.*, *United States v. Howard*, 506 F.2d 865 (5th Cir. 1975) (post-conviction proceedings for federal prisoner); *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978) (direct appeal of federal conviction).

The magistrate judge's decision to disregard the state court findings was erroneous. Juror exposure to extraneous information must be examined on case-by-case basis to determine if there is a reasonable probability of prejudice. *See Murphy*, 421 U.S. at 797, 95 S.Ct. at 2035; *Durr*, 589 F.2d at 894. Thus, the state court did not err in considering all the circumstances in evaluating prejudice, rather than concluding that the jury's exposure to information about appellee's prior conviction was a per se constitutional violation.

The state courts found that the only evidence of extraneous influence on the jury's deliberations was the information passed on to Mrs. Taylor at church, that Mrs. Taylor did not pass on the information to other jurors, and that Mrs. Tay lor voted to acquit. The trial court also specifically found that press coverage during the trial did not reveal appellee's prior trial and conviction. The trial court considered that Trimbur and Ms. Small, the latter an alternate juror, heard

25

about Sheehan's prior trial but not his conviction. The only evidence that any juror other than Mrs. Taylor learned of Sheehan's prior conviction is the testimony of Mrs. Taylor that David Gauthier spoke about appellee's prior trial and conviction. Based on this evidence, the magistrate judge inferred that other jurors must have participated in discussions of appellee's prior trial and conviction, and he then summarily concluded that appellee's right to a fair trial was violated. The magistrate judge did not distinguish among jurors who heard different information, stating that three jurors had learned of appellee's prior trial and conviction, when in fact two jurors testified that they only learned of his trial.

The trial court heard firsthand the testimony of the three jurors and was in a better position to judge the subtleties of and appropriate inferences to be drawn from their testimony. The trial court appropriately noted that the only juror to testify that she had heard of appellee's prior conviction voted to acquit. *See Durr*, 589 F.2d at 894, n. 4 (possibility that jury member alleged to have introduced outside information voted to acquit is a factor in deciding if there is a reasonable probability of prejudice). In addition, the trial court appropriately weighed the expected impact of the limiting instruction. After considering the evidence under all the circumstances, the trial court found no possibility of prejudice, concluding:

> The ultimate issue [in a motion for new trial] therefore is whether an injustice has been done to the defendant. Admitting that there may have been imperfections, this court can say without reservation or hesitation that the evidence clearly supports the jury's verdict and that no injustice was done to this defendant. Accordingly, he is not entitled to a new trial.

Exh. A at 1669. The court of appeals similarly concluded:

26

> If this testimony of Mrs. Taylor is treated as evidence of juror misconduct, it was inadmissible. If the testimony is treated as evidence of an unauthorized communication resulting from misconduct of a third person (at the church meeting), and therefore admissible, it nevertheless offended no substantial rights of the defendant, for two reasons: first, Mrs. Taylor testified that she did not pass the information on and, second, she voted for an acquittal.

*Sheehan*, 558 So.2d at 764.

Under the court's supervisory power to control the processes of its courts, this court has reversed a federal conviction where jurors learned of the defendant's prior conviction in the same matter. *United States v. Williams*, 568 F.2d 464, 470-71 (5th Cir. 1978) ("we are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged"). However, the state court in this case, who observed the entire trial, including the jurors' testimony in voir dire and at the evidentiary hearing, found no prejudice. Mrs. Taylor's vote to acquit provides at least some credibility to the trial court's analysis of the relative prejudicial effect of knowledge of appellee's prior conviction. Sheehan has pointed to no decision establishing his absolute constitutional right to a jury that is ignorant of his prior conviction. The *Williams* decision itself acknowledges that it is following a federal criminal rule, not a constitutional mandate, and that the determination of prejudice is a fact-specific inquiry. *Id.* at 469. Furthermore, even in reviewing federal criminal convictions, we give great deference to a trial court determination that there is no reasonable probability of prejudice. *See United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1983) ("appellate court should accord great weight to the trial court's finding that the [extrinsic] evidence in no way interfered with any juror's decision").

27

We conclude that the lower court s erred awarding habeas relief.  The state courts found no reasonable probability of prejudice, and this conclusion as well as the underlying factual findings is fairly supported by the record.  Under the AEDPA standards, the state court decision was not contrary to or an unreasonable application of federal law, and there is no basis for asserting that the state factfindings should not be presumed correct.

## CONCLUSION

For the foregoing reasons, we REVERSE the decision of the district court and render judgment denying appellee's request for writ of habeas corpus.

**REVERSED**.